IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Eric Kelley, | ) | 4:10-cv-01420-RBH-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | **PLAINTIFF'S MEMORANDUM IN** |
| vs. | ) | **OPPOSITION TO DEFENDANT'S** |
| | ) | **MOTION FOR SUMMARY JUDGMENT** |
| United Parcel Service, Inc., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Comes now the Plaintiff, Eric Kelley, by and through undersigned counsel, and respectfully requests that Defendant's Motion for Summary Judgment be DENIED for the following reasons:

### I. STATEMENT OF FACTS[1]

**A. Defendant's Operations and Structure**

Plaintiff Eric Kelley ("Plaintiff") was employed by Defendant United Parcel Service, Inc, ("Defendant" or "UPS") from July 1996 until his termination on January 3, 2009 as a part-time hourly employee. (Pl. Dep. 33)[2]. Hourly employees at the Florence facility are covered by a Collective Bargaining Agreement ("CBA") established between the Defendant UPS and the International Brotherhood of Teamsters Local 71 ("Union"). The CBA is very extensive and addresses numerous aspects of how and when employees may work.

---

[1] Defendant states on page three of its memorandum in support (Dkt No. 45-1) that their rendition of facts are "undisputed," however the Plaintiff does dispute their rendition of the facts as set forth herein.

[2] Plaintiff's deposition was taken three separate, non-consecutive days. To maintain conformity and avoid confusion, this memorandum will use the same identifiers as set forth in Footnote 9 of the Defendant's memorandum in support. The transcript of the first two days, July 8 and July 11, 2011 is cited as "Pl. Dep.", and the excerpts are attached herewith as Exhibit A. The transcript of the final day, September 30, 2011, is cited as "Pl. 9/30/11 Dep.", and the excerpts are attached as Exhibit B.

The Florence facility contains both hourly union employees and non-union management. At the time of Plaintiff's termination, the Florence center was managed by the business manager, Brad Hanser, who reported to the division manager[3], David Brandon. (Deposition of Robert "Brad" Hanser [hereinafter "Hanser Dep."], attached as Exhibit C, pp.14-16; Deposition of David Brandon [hereinafter "Brandon Dep."], attached as Exhibit D, pp. 14-16). The facility was also staffed by other management, including full-time and part-time supervisors. On-car supervisors are full-time supervisors who manage their assigned driver group–Florence had three driver groups. *Id*. Prior to becoming the business manager, Mr. Brandon served as an on-car supervisor at the Florence center for several years. *Id*. On Saturdays, the facility was managed by a part-time supervisor. (Deposition of Tanisha Sam [hereinafter "Sam Dep."], attached as Exhibit E, pp. 8-10, 13). During the relevant time period, the part-time supervisor for Saturday was Tanisha Sam; who would supervise the employees working at the facility on Saturdays including the Plaintiff. *Id*.

The Florence facility employs hourly union employees– both part-time and full-time, who are employed in variety of different positions. The Plaintiff held several part-time positions, including the position of vehicle shifter/air driver in the Florence package facility. (Pl. Dep. 70, 76, 80-81). Vehicle shifters move trailers to and from the dock for loading and unloading. *Id*. Part-time air drivers pick-up or deliver next-day air packages between facilities, hubs or gateways. (Pl. Dep. 82-83; Hanser Dep. 19-21). Part-time air drivers would only deliver on Saturdays or holidays, while full-time drivers delivered them during the week. *Id*. Ground

---

[3] In April 2010, UPS underwent a reorganization; wherein the geographic divisions were realigned. (Brandon Dep. 13).

packages are delivered only by full-time package car drivers– the ones who wear the brown uniforms. (Hanser Dep. 15-16). There are also employees known as "22.3 drivers", who are full-time employees that serve in two part-time roles. *Id*.

### B. Shuttle Run

One specific job assignment at the Florence facility is known as the "shuttle run", wherein next-day air packages are transported from the Florence facility to the airport facility located in Columbia, SC. On Saturdays, the shuttle run driver would wait on a driver bringing air packages from Myrtle Beach and then make the run. The Saturday shuttle run would typically depart the Florence facility around 4:00pm and would arrive back from the journey around 8:00pm. The shuttle run is supposed to be offered to 22.3 drivers based on seniority first, then offered to the part-time air drivers based on seniority second. If the part-time drivers are unavailable or unwilling, then management can require that a 22.3 driver make the shuttle run as it is ultimately their job to do so. While the Plaintiff has opted to make the shuttle run on various occasions; he has also declined to do the shuttle run without consequence prior to the termination. (Pl. Dep. 82-84, 86-89; Pl. 9/30/11 Dep. 13-15).

### C. Plaintiff's Termination

Plaintiff was terminated on Saturday, January 3, 2009 and received a termination letter dated January 9, 2009, which alleges that Plaintiff was "grossly insubordinate and abandoned [his] job." (Pl. Dep., Ex. 9). On that Saturday, the Florence facility was being supervised by part-time supervisor Tanisha Sam. (Sam Dep. 19-20). Plaintiff typically came to work around 8:00am on Saturday; and he would assist other employees in unloading what they refer to as the "air bubble" so that it could be sent down the conveyer belt and sorted. (Pl. Dep. 90-91). He would

3

then complete his normal scheduled air route; and, upon his return, perform a security check to make sure the tractor trailer doors were locked before clocking out. *Id*.

If Plaintiff is going to be offered the shuttle run, he is usually told in advance. (Pl. Dep. 92-95) However, on January 3, 2009, Plaintiff was not instructed that he would make the shuttle run until that afternoon. *Id*. After Plaintiff returned from his normal air run, Tanisha Sam showed him text messages on her cell phone from Brad Hanser stating that Plaintiff was to wait outside on the Myrtle Beach driver and then make the shuttle run. *Id*. Mr. Hanser had instructed Ms. Sam to work only 8 hours and no overtime; and that she was to lock the center door and have Plaintiff wait outside the facility until the Myrtle Beach driver arrived. *Id*. Plaintiff then raised safety concerns about being locked out of the building; expressing that it is unsafe and concerned over not having access to a telephone or facilities should something happen such as he gets sick or needed help. (Pl. Dep 103-105). The Florence center is located in an industrial area close to Interstate 95, and it is near an adult video/strip store and trailer park on the same street. (Brandon Dep. 74-77; Deposition of Walter Dickson [hereinafter "Dickson Dep."], attached as Exhibit F, pp. 55-59 & Ex. 14). In the Spring of 2008, Willie Ford, a feeder driver, was approached by two strange men on foot while he was parking and securing his trailer at the end of shift. (Pl. Dep. 129; Hanser Dep., Ex. 5). One of the men appeared partially slumped over with a pool of blood on his shirt, and the other man called out to Mr. Ford that the other had been stabbed and to call 911–indicating that he could not call 911 because of an arrest warrant. *Id*.

Plaintiff's personal cell phone was broken on the day he was terminated, which he explained to Ms. Sam earlier that day and to Mr. Hanser during the termination telephone call discussed below. (Pl. Dep. 103-105). Plaintiff reminded Ms. Sam about a similar situation that

4

occurred a few months prior to the termination in late 2008; in which Ms. Sam was told to leave work to avoid overtime and have Plaintiff wait outside the locked building for the Myrtle Beach driver so he could do the shuttle run. (Pl. Dep. 95-101).  On that occasion, Plaintiff expressed the same safety concerns to Ms. Sam; and she understood and contacted someone in management–whom Plaintiff believes was not Brad Hanser. *Id*.  During this prior incident, Ms. Sam stayed on the clock at the facility until the Myrtle Beach driver arrived without penalty to Plaintiff. *Id*.

      After talking to Plaintiff about the safety concerns, Ms. Sam called Mr. Hanser to discuss the matter.  (Pl. Dep. 102-108).  Mr. Hanser wanted to speak with Plaintiff on the phone, so Ms. Sam found Plaintiff and had him come to her office to talk with Mr. Hanser. *Id*.  Mr. Hanser asked Plaintiff what his problem was, and Plaintiff explained his safety concerns. (Pl. Dep. 108-111).  He told Mr. Hanser that he was not refusing to do the job and wanted to do it, but that he had safety concerns. *Id*.  Mr. Hanser told him he was terminated and to leave the premises. *Id*.  Plaintiff handed the phone back to Ms. Sam, who then spoke with Mr. Hanser and ended the call. *Id*.  Plaintiff then asked Ms. Sam if he was terminated, to which she stated that Mr. Hanser did not tell her that. (Pl. Dep. 116-120).  Plaintiff informed her that Mr. Hanser said he was terminated. *Id*.  Plaintiff called Mr. Hanser back and had him talk with Ms. Sam. *Id*.  Once the call ended, she looked at Plaintiff and informed him that Mr. Hanser said he was terminated. *Id*.  Ms. Sam also told Plaintiff that she was instructed by Mr. Hanser to send a message to Jamie McDonald to do the shuttle run; and Plaintiff subsequently witnessed Ms. Sam get on the

computer to presumably send a message to Mr. McDonald's DIAD.[4] (Pl. 9/30/11 Dep. 21-26). Because he had been terminated and instructed to leave the premises, Plaintiff clocked out and began exiting the building with Ms. Sam. (Pl. Dep. 120-126). The Myrtle Beach driver arrived at that time, however Plaintiff was already terminated and unable to make the run. *Id*.

Mr. Hanser contacted other drivers including 22.3 driver Jamie McDonald, and Mr. Hanser indicated that the shuttle run offer was on a voluntary basis and they were free to decline. (Declaration of Robert B. Hanser [hereinafter "Hanser Declaration"] , attached to the Defendant's memorandum as Exhibit A). Mr. McDonald refused to make the shuttle run but was not reprimanded for the refusal. *Id*. The shuttle run was instead performed by Josh Wells, a part-time employee. *Id*.

Plaintiff subsequently exhausted his administrative remedies through the grievance procedure provided by the CBA, but the termination was upheld. He then filed a timely charge of race discrimination with the EEOC and timely filed this action after receiving a right to sue notice from the EEOC.

## II. ARGUMENT

### A.     Standard for Summary Judgment

Summary judgment should only be granted in those cases where it is perfectly clear that no issue of fact is involved and that inquiry into the facts is not necessary. Summary judgment should only be granted in those cases where it is perfectly clear that no issue of fact is involved

---

[4] DIAD is an acronym for "Delivery Information Acquisition Device", which is used to scan packages, communicate messages with the facility, and have the customers sign when receiving packages. (Brandon Dep. 52).

and that inquiry into the facts is not necessary. *McKinney v. Board of Trustees of Maryland Community College*, 955 F.2d 924 (4th Cir. 1992).

A district court should not grant summary judgment "unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under the circumstances." *Campbell v. Hewitt, Coleman & Assocs.*, 21 F.3d 52, 55 (4th Cir. 1994).

At the summary judgment stage of litigation, the trial court's limited function is not to weigh the evidence; rather, its job is to determine whether there is a genuine issue of fact which justifies a trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The facts are material where they might affect the outcome of a dispute. *Anderson*, 477 U.S. at 248. Such material facts are in genuine dispute when the evidence "may be reasonably resolved in favor of either party." *Id.* at 250. The judge's limited role at summary judgment is clear:

> The judge must ask himself not whether the evidence unmistakably favors one side or the other, but whether a fair minded jury could return a verdict for the plaintiff on the evidence presented.

*Id.* at 252. It is well-settled that summary judgment is seldom appropriate when motive and intent are at issue. *Ballinger v. North Carolina Agric. Extension Serv.*, 815 F.2d 1001, 1005 (4th Cir. 1987). Indeed, summary judgment is inappropriate "even where there is no dispute as to the evidentiary facts but only as to the conclusions to be drawn therefrom." *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979). This means that as the non-moving party, plaintiff is entitled

> to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, all internal conflicts in it resolved favorably to him, the most favorable of all possible alternative

>        inferences drawn in his behalf; and finally, to be given the benefit of
>        all favorable legal theories involved by the evidence so considered.

*Charbonnages*, 597 F.2d at 414; *see also*, *M&M Medical Supplies & Servs. v. Pleasant Valley Hosp.*, 981 F.2d 160 (4th Cir. 1992).

**B. Disciplinary action other than the termination**

Circumstantial evidence may be considered as part of the *McDonnell Douglas* framework to support a claim of Title VII race discrimination. The Defendant spends several pages in their memorandum in support of summary judgment addressing why "claims regarding alleged disciplinary action other than his discharge" are barred as both untimely and for failing to exhaust administrative remedies. (Def. Memo. Supp. Sum. J., Dkt No. 45-1, pp. 11-15). However, Plaintiff is only alleging a discriminatory discharge claim in violation of Title VII, and he is not alleging separate claims for each disciplinary action other than the termination.

Even though Plaintiff is not asserting separate claims for prior disciplinary action; he is alleging that these acts are circumstantial evidence that support his discriminatory discharge claim. Generally, the case law cited by Defendant in support of their untimely and failure to exhaust administrative remedies arguments are addressing situations where a plaintiff is seeking relief for a claim in their Complaint that was allegedly untimely filed with the EEOC or failed to exhaust administrative remedies with the EEOC. These cases differ drastically from the instant case; wherein this Plaintiff is only seeking relief for the discriminatory discharge claim, and using other incidents as circumstantial evidence to support this claim.

It is well established that a Plaintiff may use indirect or circumstantial evidence to support a claim for Title VII race discrimination using the *McDonnell Douglas* framework. (*See*

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Historical or related acts of discrimination cannot be excluded as supporting evidence simply because a charge was not filed or not filed within 300 days.[5] Accordingly, such evidence should be considered–in a light most favorable to Plaintiff–to support the Plaintiff's discriminatory discharge claim.

**C. Summary judgment should be *denied* as to the discriminatory discharge claim.**

Title VII makes it an "unlawful employment practice" for an employer to discriminate against any individual because of the individual's race. (42 U.S.C. § 2000e-2(a)(1) (2000)). A claim of discrimination may be made either through direct evidence of discriminatory intent or by proving an inference of discriminatory intent under the burden-shifting *McDonnell Douglas* test. *Martin v. Alumax of South Carolina, Inc.*, 380 F. Supp. 2d 723, 726 (D.S.C. 2005) (citing *Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1227-28 (4th Cir. 1998)). Because many discrimination claims lack direct evidence, the *McDonnell Douglas* framework is used to analyze "claims that are based principally on circumstantial evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000). If the plaintiff cannot produce direct evidence of discrimination, the plaintiff should proceed under the *McDonnell Douglas* framework. *Martin*, 380 F. Supp. 2d at 726.

In the case at hand, Plaintiff has established a *prima facie* case of discrimination and the evidence shows that the Defendant's alleged legitimate, non-discriminatory reasons for the termination are a pretext for unlawful discrimination.

**1. Plaintiff can establish a *prima facie* case of discriminatory discharge.**

---

[5] Defendant does not appear to assert that the other disciplinary acts cannot be considered as evidence in support of the discriminatory discharge; however the Plaintiff asserts this point out of an abundance of caution.

9

The Plaintiff has established a *prima facie* case of discrimination. "Demonstrating a prima facie case is <u>not onerous</u>; it requires only that the plaintiff establish facts adequate to permit an <u>inference</u> of discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (emphasis added) (citing Williams v. Ford Motor Co., 14 F.3d 1305, 1308 (8th Cir.1994); and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253-54, 101 S. Ct. 1089, 1093-94, 67 L. Ed. 2d 207 (1981)).

The Defendant argues[6] that Plaintiff is unable to point to a valid comparator – a similarly situated individual outside of his protected class.[7] The Defendant supports this argument by erroneously asserting that Jamie McDonald is not a valid comparator, because he was not insubordinate. This argument fails as McDonald is a valid comparator. McDonald is an air driver at the Florence facility under the supervision of Brad Hanser (business manager of the Florence center), and he was working on the day of the discharge. Defendant's assertion that Hanser offered a white driver the **option to volunteer** for the shuttle run, yet he expressly instructed the Plaintiff, a black driver, to do the shuttle run is itself disparate treatment and actually supports McDonald as a valid comparator.

Moreover, there is a dispute of material fact that should be resolved in a light most favorable to Plaintiff. Defendant bases its assertion on the Hanser Declaration, which is attached as an exhibit to their memorandum. Hanser alleges in the declaration that he was allowed to require Plaintiff to make the shuttle run first and then subsequently offer the shuttle run on a

---

[6] Plaintiff's reference to the Defendant's arguments are referring to the relevant portions of the Defendant's Memorandum in Support of Summary Judgment, Dkt. No. 45-1.

[7] The other elements of the *prima facie* case are not disputed, thus the Plaintiff does not address them herein.

volunteer basis to other drivers. (*See* Hanser Declaration).  Hanser further alleges that Plaintiff refused the shuttle run. *Id*.  However, the Plaintiff explicitly denies refusing the shuttle run. (Pl. Dep. 108-111).  Furthermore, a 22.3 driver– not a part-time driver– should have been ultimately required to make the run. (Pl. Dep. 82-84, 86-89; Pl. 9/30/11 Dep. 13-15; Deposition of Octarius Blyther [hereinafter "Blyther Dep."], attached as Exhibit G, pp. 19-20).  A 22.3 air driver, such as McDonald, should have been offered the job before the part-time air drivers such as Plaintiff.  *Id*.  In the event the 22.3 drivers refuse, the part-time air drivers would be offered the position. *Id*.  However, if no part-time air driver was available, a 22.3 driver would be **required** to perform the shuttle run. *Id*.

These facts, considered in a light most favorable to Plaintiff, show that McDonald is a valid comparator.  McDonald and Plaintiff are both air drivers and the same supervisor interacted with both; yet McDonald was treated better than Plaintiff.

### 2.  Defendant's proffered legitimate, non-discriminatory reason is a pretext for race discrimination.

Once the Plaintiff establishes a *prima facie* case of discrimination under the *McDonnell-Douglas* framework, the Defendant then must offer a legitimate, non-discriminatory reason for the adverse employment action.  The Plaintiff must then demonstrate that the reason proffered by the employer is pretextual.  Pretext may be shown through evidence that employees outside the protected class were treated differently.  *See McDonnell Douglas*, 411 U.S. at 804.  The Fourth Circuit has also recognized pretext when the defendant offers inconsistent post-hoc explanations for the employment decision. *See E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 852-53 (4th Cir. 2001).  The Plaintiff in this action has properly demonstrated that the Defendant's proffered

reason for termination is pretextual.

As already discussed in the above section, there are inconsistencies with Hanser's testimony/declaration that infer pretext. (*See* Section III.C.1, *supra*). In his deposition testimony, Hanser explicitly denies telling the Plaintiff he was terminated; instead claiming to say that he would be terminated if he did not wait outside the locked building on the Myrtle Beach driver and do the shuttle run. (Hanser Dep. 29-33). He also testifies that the Plaintiff told him he would not wait on the Myrtle Beach driver. *Id*. This is not true according to the Plaintiff's testimony. Plaintiff testified that he was told by Hanser that he was terminated and to leave the premises. (Pl. Dep. 108-111, 116-126). Moreover, he made sure to call Hanser back and have him confirm this to Ms. Sam. *Id*. The reason the Plaintiff did not do the shuttle run when the Myrtle Beach driver arrived, was that Hanser had explicitly terminated him**.** *Id*. The Plaintiff also never told Hanser that he would not wait, but he told Hanser he was not refusing the job and only raised safety concerns. *Id*. It is apparent to Plaintiff that Hanser has changed his story to cover up his discriminatory purpose.

The treatment of Plaintiff prior to the discharge also supports a showing of pretext. (Pl. Dep. 144-48, 154-55**,** 163-171; Pl 9/30/11 Dep. 8-11, 68-69). Plaintiff was unfairly disqualified from becoming a full-time driver on several occasions. In 2005, he was informed by a member of human resources that he had a valid road test on file and did not need to take another. (Pl. Dep. 148-151; Pl 9/30/11 Dep., Ex. 14). However, David Brandon told Plaintiff he would take another road test regardless of what HR told him. *Id*. He was then subsequently disqualified by Hanser, who was an on-car supervisor at the time and administered the road test. *Id*. In 2006, he was disqualified again by Hanser for miss scan packages. (Pl. Dep. 171-176; Pl. 9/30/11 Dep.,

Ex. 16). In 2008, Plaintiff was disqualified for incorrectly sheeting a package. However, Plaintiff was sheeting in accordance with the way he was told by his supervisor. Phillip Santos (white male) was also charged with incorrectly sheeting a package during this time, however he was NOT disqualified. Later in 2008, Chris Sims (white male) told Plaintiff that he was sent a message from the supervisor to sheet up a missed package using the same method that Plaintiff was disqualified for. (Pl. Dep. 154-163). On another occasion in 2008, Plaintiff successfully completed a required annual safety ride with supervisor Tom Drumm. (Pl. Dep. 163-171). David Brandon then approached Plaintiff and started grilling him over a ten point safety commentary. *Id*. Plaintiff could state the ten points, but Brandon made him try to repeat verbatim all of the sub points. *Id*. Plaintiff was not required to memorize these points verbatim and could not do it, so Brandon then removed him as a driver. *Id*.

Other employees at the Florence center have indicated that Hanser was acting discriminatory towards them, including Mr. Blyther (black male) and a part-time supervisor named Tonya (black female). (Blyther Dep. 13; Pl. Dep. 138-141). Based on the above evidence, the Plaintiff has clearly established pretext in this case and summary judgment should be denied.

## IV. CONCLUSION

Plaintiff has properly established his discriminatory discharge claim. Many issues addressed herein are material questions of fact that should be decided by a jury. For the foregoing reasons, Plaintiff respectfully requests that Defendant's Motion for Summary Judgment be DENIED.

          Respectfully Submitted,

          J. Lewis Cromer & Associations

          BY:    s/Julius W. Babb
                J. Lewis Cromer (#362)
                Julius W. Babb, IV (#10500)
                Tandi D. Ross (#10370)
                1522 Lady Street
                Post Office Box 11675
                Columbia, South Carolina 29211
                Phone  803-799-9530
                Fax     803-799-9533

          Attorneys for Plaintiff

December 22, 2011