ERIC KELLEY                          121

1        sure that's not a witness trying to touch base.

2        **(Off the Record from 11:15 a.m until 4:43 p.m.)**

3   COURT   REPORTER:    Mr.  Kelley,  you  are  still  under

4        oath.  Okay?

5   A:   Okay.

6   Q:   All  right,  Mr.  Kelley,  and  thanks  for  your

7        patience.  I  know  it's  been  a  long  day,  but  --

8   A:   Yes.

9   Q:   -- we'll  try  to  finish  up  as  quickly  as  we  can.

10        I  think  when  we  left  off  with  your  deposition

11        testimony  earlier,  you  indicated  that  you  had

12        walked  out  of  Ms.  Sam's  office  and  shortly

13        thereafter  seen  the  Myrtle  Beach  driver.   Is

14        that  correct?

15   A:   Right.  After  I  was  terminated.  Yes.

16   Q:   Okay.  Tell  me  where  you  were  physically  in  the

17        building  when  you  saw  the  driver.  Were  you  in

18        the  building;  were  you  outside  the  building?

19   A:   I  was  in  the  building.

20   Q:   Okay.  And  did  you  have  any  conversation  with

21        the  driver?

22   A:   I  sure  did.

23   Q:   Okay.  And  what  did  you  talk  about?

24   A:   I  just  basically  told  him  that  it  was  nice

25        working  with  him  and  he  kind  of  looked  at  me,

ERIC KELLEY                                    122

1    you know, a surprised look and I told him that

2    I was just terminated.

3    Q:   And what's that driver's name?

4    A:   I don't remember.   I know he is an older

5         gentleman.

6    Q:   Older gentleman?  What race is he?

7    A:   White.

8    Q:   And it has been the same driver doing that

9         Myrtle Beach run to Florence?

10   A:   Right.

11   Q:   Same driver you had worked with in the past?

12   A:   The Myrtle Beach driver?

13   Q:   Correct.

14   A:   Correct.  But now he wouldn't always be the one

15        that brings it.

16   Q:   But usually the one?

17   A:   Right.

18   Q:   Had you punched out at that time?

19   A:   Yes.  I was terminated, so I punched out.

20   Q:   Well, I understand that you thought you were

21        terminated and you punched out.  I'm trying to

22        figure out whether you punched out before you

23        saw the Myrtle Beach driver or after.

24   A:   Before.  I was terminated before he got there.

25   Q:   Okay.  So I thought that you testified that you

ERIC KELLEY                                          123

1      saw the Myrtle Beach driver right after you

2      came out of Ms. Sam's office.

3   A: Right.  I was terminated when I come out of the

4      office.

5   Q: I understand and I understand why you're saying

6      that you were terminated at that time and I

7      understand that you -- that that's your

8      testimony.  What I'm trying to get at is just

9      trying to get the time line, okay?  So, you

10     left Ms. Sam's office and you saw the Myrtle

11     Beach driver right then?  You said he rounded

12     the corner and there he was?

13  A: Right.  He was coming into the building and I

14     was leaving out.

15  Q: Okay.  So when you left Ms. Sam's office, you

16     went to punch out and then you saw the Myrtle

17     Beach driver or the other way around?

18  A: I punched out after I was terminated.  I can't

19     --

20  Q: I understand.  I'm ask --

21  A: The best way I can answer you.

22  Q: Well --

23  A: And after that, after I was terminated, I

24     walked out, you know, when they told me I had

25     to leave the premises, as I was walking out of

ERIC KELLEY                                      124

1          the office and turned the corner, the Myrtle

2          Beach driver was coming in.

3     Q:   Right.    What I'm trying to get at is the

4          physical act of punching out, can you recall

5          whether or not you did that before you saw the

6          Myrtle Beach driver or after you saw the Myrtle

7          Beach driver?

8     A:   Oh, before.

9     Q:   You punched out before you saw the Myrtle Beach

10         driver?

11    A:   Right.    Because I was terminated.    I had to go

12         home.

13    Q:   I understand that it's your testimony you were

14         terminated.    You had no choice but to go home.

15         I'm just trying to get at physically, the time

16         line of events that took place.    And so I was

17         confused because your earlier testimony made it

18         sound like as soon as you came out of Ms. Sam's

19         office, the Myrtle Beach driver was right

20         there.    You turned the corner and there he was.

21    A:   There again, after they terminated me, when he

22         confirmed that I was terminated with Tanisha,

23         yes, I was leaving to go home and when I

24         rounded the corner, there was the Myrtle Beach

25         driver.

ERIC KELLEY                                   125

1   Q:   And you had already punched out by that time?

2   A:   That's correct.

3   Q:   Okay.   That's all I'm trying to figure out,

4        okay?   Now, at that point, you walked outside?

5   A:   Right.

6   Q:   Okay.   You didn't speak to Tanisha any further

7        about the shuttle run?

8   A:   No.

9   Q:   You didn't ask her if you could make the

10       shuttle run now that the Myrtle Beach driver

11       had arrived?

12  A:   I made a -- I made a comment when I said

13       there's the Myrtle Beach driver right there,

14       but I can't remember --

15  Q:   And you can't --

16  A:   But I don't know whether I made the comment or

17       whether she made the comment about, you know,

18       well, I can't take it because I'm terminated.

19  Q:   That sounds like a comment you made.

20  MR. BABB: Object to the form of the question.

21  Q:    Is that a comment that you made?

22  A:   You know, I can't remember who made it, but I

23       think it was -- I'm not sure.   I'm not sure.

24  Q:   Okay.   So after the Myrtle Beach driver, after

25       you saw the Myrtle Beach driver, you had some

**ERIC KELLEY** 126

1    other conversation with Ms. Sam after that.   Is

2    that your testimony?

3  A:  Right.   Because after that happened, we were

4    all -- I was going out first and she was coming

5    behind me because she had to get off the clock.

6    It was about time for her to get off.

7  Q:  So this was when you were outside the building

8    or still inside the building?

9  A:  I was exiting out of the building.

10  Q:  Leaving the building?

11  A:  Right.

12  Q:  Okay.   But you didn't request that you be

13    allowed to punch back in and take the Myrtle

14    Beach packages to Columbia?

15  A:  No.   I was terminated.

16  Q:  What did you do next?

17  A:  I proceeded to go to my car and I went home.

18  Q:  Okay.   And what was your next communication

19    with anyone at UPS?

20  A:  I contacted my shop steward.

21  Q:  Okay.   Did you speak with -- who was your shop

22    steward at the time?

23  A:  At that time, that was Jermaine Pryor.

24  Q:  And how did you contact Mr. Pryor?

25  A:  I think I contacted him when I got home, but I

ERIC KELLEY                               129

1          just sitting.

2     Q:   At the time as of January 3, 2009, there has

3          been some testimony and exhibits offered about

4          a statement by Willie Ford about being

5          approached by two individuals at 3:00 a.m. in

6          the morning of sometime in spring 2008, is that

7          correct?

8     A:   Yes.

9     Q:   At the time that you, as of January 3, 2009,

10         were you aware of that alleged incident?

11    A:   Yes, I was.

12    Q:   From Mr. Ford himself?

13    A:   I've heard, yes, I've heard him talk about it.

14    Q:   And when did you hear him talk about it?

15    A:   I don't remember.

16    Q:   But you are sure that it was prior to your

17         discharge?

18    A:   Oh, yes.

19    Q:   Do you recall any discussion with either Ms.

20         Sam or Mr. Hanser prior to leaving the center

21         about when the Myrtle Beach driver was going to

22         arrive?

23    A:   Repeat that.

24    Q:   Do you recall any discussion with Ms. Sam or

25         Mr. Hanser about how long you would have to

**ERIC KELLEY**                                          138

1          local level hearing there was no agreement
2          reached between the union and the company about
3          your discharge, is that correct?
4     A:   That's correct.
5     Q:   And so the union elected to pursue it to panel?
6     A:   Right.
7     Q:   Did you have any contact with anyone in UPS
8          management between the local level and the
9          panel?  In other words, did you ever call up
10         Brad Hanser or any on-car supervisors at UPS
11         about -- between the local level and the panel?
12    A:   Brad or -- you're saying anybody in management?
13    Q:   Anybody in management.
14    A:   Did I call them about this?
15    Q:   I'm asking if you spoke with anyone in UPS
16         management  in the Florence center between the
17         local level -- after the local level meeting
18         ended and before the panel, at any point in
19         time in there, did you talk with anyone at UPS
20         management in the Florence center?
21    A:   I remember talking to my -- she's a part-time
22         supervisor.
23    Q:   And who was that?
24    A:   That would be -- I can't remember her last
25         name.  Tonya.

ERIC KELLEY                                      139

1    Q:    And why did you talk to her?

2    A:    Just general conversation.

3    Q:    And was this at the center or somewhere else?

4    A:    This was somewhere else.

5    Q:    By telephone?

6    A:    Right.

7    Q:    By cell phone?

8    A:    That's correct.

9    Q:    You had replaced your cell phone by this time?

10   A:    Right.

11   Q:    Or was it working --

12   A:    Well, I don't know whether I replaced it or

13         whether I had it fixed, but I -- this is the

14         third cell phone that I had.

15   Q:    And did you talk with Tonya about your

16         discharge at all?

17   A:    I did.

18   Q:    And tell me about that discussion.

19   A:    You know, I can't remember.  I haven't talked

20         to her in awhile.  It's been a long time.

21   Q:    And you don't recall what it is you talked

22         about with her?

23   A:    I mean, we talked about, you know, me being

24         terminated.  But so far as remembering exactly

25         what I said, I don't.  I don't remember that.

ERIC KELLEY                                    140

1   Q:   Do you remember what she said?

2   A:   No, I don't.

3   Q:   Did she express an opinion as to your

4        discharge?

5   A:   I know she one time mentioned that she felt

6        like Brad was -- what's the word I'm looking

7        for -- was being discriminatory against her.

8   Q:   Discriminatory on what basis?

9   A:   You know, the way he was treating her.

10  Q:   Yeah.   I'm sorry, I meant discriminating

11       against her based on her race, based on gender,

12       based on some other factor?  Did she say?

13  A:   Right.  Well, that's what I gather.  I don't --

14       just like I said, these conversations been so

15       long, I --

16  Q:   I understand.   But you have very specific

17       recall about some conversations and not about

18       others, so what I'm trying to figure out is --

19       get as much detail as I can, okay?  Do you

20       recall --

21  **MR. BABB:**  Objection to statement.

22  **MR. GARTLAND:**  Okay.

23  **MR. BABB:**  Go ahead.

24  Q:   Do you recall whether she mentioned

25       specifically that she felt the conduct was

ERIC KELLEY                                                   141

1         discriminatory?

2    A:   You know, just his behavior towards her.

3    Q:   Was that her word or is that your word?

4    A:   Those was her words.

5    Q:   Discriminatory,    she    used    that word

6         specifically?

7    A:   Right, I remember those -- I can -- can

8         remember that, that --

9    Q:   Okay.

10   A:   -- she felt that way.

11   Q:   And about what specific -- did she give

12        examples, were there specific employment

13        decisions?

14   A:   No.  I mean, just -- just like I said.  I think

15        she said the way he acted towards her.

16   Q:   For the record, what is Tonya's race?

17   A:   Black.

18   Q:   Did you speak with anyone else at the Florence

19        center in management between the local level

20        hearing and the panel?

21   A:   In management, no, I don't -- I don't recall

22        speaking to anybody else.

23   Q:   Okay.

24   **(Defendant's Exhibit Number Twelve was marked for**

25   **identification purposes.)**

ERIC KELLEY                                144

1    (Defendant's Exhibit Number Thirteen was marked for
2    identification purposes.)
3    Q:    All right, Mr. Kelley.    Have you had an
4          opportunity to review Exhibit Thirteen?
5    A:    Yes, I have.
6    Q:    Okay.  Have you seen this document before?
7    A:    Yes.
8    Q:    Does it appear to be a correct copy of the
9          complaint filed against UPS on your behalf in
10         this case?
11   A:    Yes.
12   Q:    And you understand that you are asserting a
13         claim for race discrimination against UPS,
14         correct?
15   A:    That's correct.
16   Q:    If you could, tell me each action that you
17         believe UPS took against you because of your
18         race.
19   A:    There was one incident where I had to -- with
20         a road test and I had to do some backing and --
21   Q:    Okay.  Why don't we do this, and I'm sorry to
22         interrupt you, but I just want to figure out
23         the best way to do this because you'll probably
24         have more than one, right, that you're going to
25         list?

ERIC KELLEY                                          145

1   A:   Exactly.

2   Q:   Let's list them first and then we can talk

3        about them individually, okay?  So we're just

4        going to list them right now and then we can

5        get into the detail of each of them once you

6        finish the list, okay?

7   A:   Okay.

8   Q:   So for right now I just want you to list it.

9        You said the road test where there was some

10       backing involved?

11  A:   Exactly.

12  Q:   Okay.  Was that in 2005?

13  A:   That's correct.

14  Q:   Okay.  And the next action that you believe was

15       taken against you because of your race?

16  A:   Where they said that I sheeted packages wrong

17       and then -- well, you said we'll get into them

18       later.

19  Q:   Yeah.  That was a disqualification at a time

20       that you were trying to become a full-time

21       package car driver?

22  A:   That's correct.

23  Q:   Do you recall what year that took place?

24  A:   I want to say that was -- that was in -- that

25       one was in '08.

ERIC KELLEY                               146

1    Q:    All right.  And the next one?

2    A:    The next one were in January the --

3    Q:    The discharge.

4    A:    The discharge, yes.

5    Q:    Okay.  Any others?

6    A:    There again, this was -- this was one where --

7          where they asked me -- where they disqualified

8          me for sheeting up a package incorrect, but

9          they sent a message to a white guy to sheet it

10         up on the same -- the same way that I got

11         disqualified.

12   Q:    Okay.    But    that's    still    the  same

13         disqualification and you think it was 2008,

14         correct?

15   A:    This was a different incident.

16   Q:    Right, involving another driver, a white

17         driver.  Sorry, I may be confused.  You've

18         listed three incidents that you think were

19         motivated by race discrimination.

20   A:    Right.

21   Q:    And then you just mentioned a white driver

22         being given instruction to sheet up a package

23         in a similar way.

24   A:    Exactly.

25   Q:    Is that a separate incident that you think was

ERIC KELLEY                                    147

1          taken against you or does that relate to your

2          disqualification in 2008?

3     A:   I was disqualified three times.

4     Q:   Okay.

5     A:   The first time was the backing.

6     Q:   In 2005.

7     A:   Right.  The second time was about the scanning

8          of packages being left on the truck.

9     Q:   And when was that?

10    A:   It was in '07 or '06.

11    Q:   And you said you were disqualified at that time

12         because of packages left on the truck?

13    A:   Yeah, they say I left some un-scanned packages

14         on the --

15    Q:   Un-scanned and undelivered?

16    A:   Well, what's the right terminology for it?

17    Q:   Service failure?  Missed packages?

18    A:   Missed packages, right.

19    Q:   Sorry, I was just -- I didn't mean to put words

20         in your mouth, I just -- I know these terms, so

21         I'm trying to --

22    A:   Okay.

23    Q:   -- fill in the blanks where I can.  Okay, so

24         those four events.  Any others?

25    A:   As of right now, I can't -- I can't remember

ERIC KELLEY                                          148

1        any of them, but as we get into them, I mean,

2        they may come to me.

3   Q:   Okay.  And if they come to you and you want to

4        add to the list, just let me know.

5   A:   Okay.

6   Q:   You mentioned first the road test in 2005.

7   A:   Exactly.

8   Q:   What is it about that disqualification that you

9        believe was discriminatory?

10  A:   Okay.  Well, at first I wasn't -- I wasn't

11       supposed to do a road test.  I was told by

12       human resources that there was one on file

13       where I had passed.

14  Q:   And what year was that from?

15  A:   That was '05 also.

16  Q:   So you had previously done a road test in '05?

17  A:   Way before '05.  Before '05 I may have taken at

18       least two or three of them trying to become an

19       air driver, but every time I got ready to go to

20       school they would always tell me that there was

21       something that I didn't complete.

22  Q:   Okay.  Isn't a driver required to complete a

23       road test every time he or she tries to

24       qualify?

25  A:   No.

ERIC KELLEY                                              149

1    Q:    That's not the rule?

2    A:    No, not according to human resources.

3    Q:    Okay.  Have you ever had any responsibility for

4          administering road tests?

5    A:    Meaning?

6    Q:    Have    you    ever    been    responsible for

7          administering a road test to someone who is

8          trying to qualify to go drive?

9    A:    I don't get what you're --

10   Q:    I'm trying to -- who administers road tests in

11         the Florence facility?

12   A:    You mean the instructor?

13   Q:    Correct.

14   A:    For me, that was Brad.

15   Q:    But what position was Brad at the time?

16   A:    He was an on car sup.

17   Q:    Okay.  So is it fair to say --

18   A:    But that was in -- excuse me.

19   Q:    Go ahead.

20   A:    That was in two -- that was when I was trying

21         to go to full-time.  But before then, the other

22         road tests that I've taken in the past, it

23         wasn't him.

24   Q:    Was it an on-car supervisor?

25   A:    Right, I remember one guy name and it was Ron

ERIC KELLEY                                    150

1         Watson.

2    Q:   Okay.  But you've never been the person giving

3         the road test --

4    A:   Oh, no.

5    Q:   -- to someone else?

6    A:   No.

7    Q:   That's    never    been    part    of    your job

8         responsibilities.

9    A:   Right.

10   Q:   So your understanding of the policy is based on

11        the alleged comment from someone in HR?

12   A:   Right.

13   Q:   Okay.  And who is that person again?

14   A:   That was Mike Bookman.

15   Q:   Okay.   And did you speak with Mr. Bookman

16        before or after the road test in 2005?

17   A:   Before.  And he stated that I did not need to

18        take a road test.

19   Q:   And then you received a road test.

20   A:   Right, David forced me to take it.

21   Q:   How do you know it was David?

22   A:   Because he actually -- he actually told me

23        himself.  Told me that after I talked with him

24        and told him what Mike Bookman said and also

25        Mike talked to him, but he told me that I was

ERIC KELLEY                                                151

1      going to take a road test.  If I wanted to go

2      to school, I was going to take a road test,

3      another road test.

4  Q:  So you believe it was his decision for you to

5      take another road test before you qualify?

6  A:  David, yes.

7  Q:  Okay.  And why is it that you believe that

8      decision was discriminatory?

9  A:  Because later on there was a white driver that

10     didn't have to do any backing at all.

11 Q:  As part of his road test?

12 A:  Right.

13 Q:  Who was that white driver?

14 A:  That was Jason Johnson.

15 Q:  And do you know who Mr. Johnson's instructor

16     was for that road test?

17 A:  I believe it was Molly.

18 Q:  A different instructor than your road test,

19     correct?

20 A:  Right, and there was also Ms. Mary.

21 Q:  Ms. Mary was also administering road tests?

22     I'm sorry, what is it about Ms. Mary that you

23     think is relevant?

24 A:  I mean, she -- during that time she was just

25     along with Jason.

ERIC KELLEY                                    154

1    A:    And neither one of them had to back.

2    Q:    Right.  But if it's your contention that you

3          were singled out because you're black --

4    A:    Black male.

5    Q:    Black male.

6    A:    At the time.

7    Q:    But they also -- it's your testimony that both

8          a male and a black employee were not required

9          to do backing or received more favorable

10         treatment, is that correct?

11   A:    A white male and a black female, right.

12   Q:    Okay, all right.  What about the incident in

13         which you were disqualified, I think you

14         testified you think it was in 2008, for

15         sheeting up packages incorrectly?  Tell me what

16         you leads you to believe that that was

17         discriminatory on the basis of your race.

18   A:    That's in 2008?

19   Q:    I think you testified that you believed it was

20         in 2008.

21   A:    Okay.  Where I was disqualified for sheeting up

22         a package wrong and Phil Santos, which is a

23         white driver, sheeted up a package incorrect

24         and he was just put on a conference call and

25         went on to become a full-time driver.

| | ERIC KELLEY | 155 |

1   Q:   So you're alleging that this incident with Mr.

2        Santos took place during his qualification

3        period?

4   A:   Yes.

5   Q:   His first 30 days?

6   A:   Right.

7   Q:   And did it take place -- the time in which you

8        were disqualified for sheeting up packages

9        incorrectly, was that during the 30 day period?

10   A:   That's correct.

11   Q:   Okay.    And do you recall what it is

12        specifically the company said you did wrong

13        with respect to those packages?    In other

14        words, what I'm trying to figure out is were

15        they missed packages or were they packages that

16        you scanned with the incorrect code?    What

17        exactly was the problem, according to them?

18   A:   In 2008 -- okay, yes, they said that I sheeted

19        up the packages wrong as they were supposed to

20        be sheeted up as missed, but they were sheeted

21        up as not ready, which I was instructed to

22        sheet them up that way.

23   Q:   By who?

24   A:   By -- by a guy named Blake.

25   Q:   I'm sorry, Blake?

ERIC KELLEY                                                    156

1    A:    Blake.

2    Q:    Do you recall Blake's last name?

3    A:    I don't remember his last name.  I know he no

4          longer works with the company.

5    Q:    Okay.  What was Blake's position at the time?

6    A:    At that time he was an on-car supervisor and --

7    Q:    And this instruction, the alleged conversation

8          with Blake took place during?

9    A:    PTM meeting.

10   Q:    And as best you can recall, what was the

11         instruction from Blake?

12   A:    You know, if you find a missed package on your

13         truck, you know, don't sheet it up as missed,

14         sheet it up as not ready.

15   Q:    Do you have any understanding as to whether

16         that's a correct statement of UPS policy?

17   MR. BABB:  Object to the form of the question.

18   A:    I wouldn't know.

19   Q:    In other words, is that the proper procedure or

20         do you think Blake was wrong?

21   A:    You know, I was doing what I was -- I didn't --

22         I don't think that that's the proper procedure,

23         but I was doing as I was instructed, you know,

24         to sheet them up the way he wanted them sheeted

25         up.  I mean, I didn't know.

*CREEL COURT REPORTING, INC.*
1230 Richland Street / Columbia, SC 29201
(803) 252-3445 / (800) 822-0896

ERIC KELLEY                              157

1  Q:  But Blake isn't the only person whoever

2      provided you instruction on sheeting up

3      packages, correct?

4  A:  To sheet them up that way, he was -- that's the

5      first time I heard of not ready.

6  Q:  But you received training or instruction from

7      other on-car supervisors about the process of

8      sheeting up packages correctly.

9  A:  Right.

10  Q:  Okay.  And do you recall any instruction from

11      other supervisors that was different from the

12      instruction that Blake gave you?  Do you recall

13      -- let me ask it this way.  Do you recall any

14      other supervisors ever providing you

15      instructions on how to code a missed package?

16  A:  I mean, you know, during your training, you

17      know, you're just scanning and if you -- if you

18      -- whatever you're doing or whoever you're

19      giving the package to, you put it in the board

20      as that.  But just that day, if -- all I know

21      is the missed package, he instructed us not to

22      sheet them up as missed; as to sheet them up as

23      not ready.

24  Q:  And then --

25  A:  And, you know, I didn't know whether that was,

ERIC KELLEY                                    158

1      you know, incorrect or bad.  You know, I just
2      went along with it because that's --
3  Q:  But you were later told that that is incorrect,
4      right?
5  A:  Right, because I was disqualified.
6  Q:  Right.  And how did they say those packages
7      should have been coded?
8  A:  As a miss.
9  Q:  Okay.  And so you testified that you believe
10     Phil Santos also sheeted up packages
11     incorrectly?
12 A:  Right, he sheeted up --
13 Q:  During his -- during -- I'm sorry.  During his
14     qualification period?
15 A:  Right, he sheeted up a package incorrectly and
16     they put him on a conference call.
17 Q:  And how are you aware of Mr. Santos' work
18     history?  How did you come to know of Mr.
19     Santos allegedly --
20 A:  Did that?
21 Q:  -- incorrectly scanning a package?  Yes.
22 A:  Because he came and told me.
23 Q:  After this conference call?
24 A:  Right.
25 Q:  And do you know why he told you?

ERIC KELLEY                                    159

1   A:   I don't know why, but I mean, me and him is --

2        I guess he was concerned why they would

3        disqualify me and not disqualify him.

4   Q:   Was this the same time period as you were --

5        your qualification period and Mr. Santos'

6        qualification period, we're talking about the

7        same time frame?

8   A:   No, I was -- he came after I did.

9   Q:   Okay.

10  A:   I was disqualified and then he was -- come up

11       next to be a full-time driver.

12  Q:   In the same year?

13  A:   Yes, in that same year.

14  Q:   Okay. And do you know what exactly Mr. Santos

15       did wrong in terms of scanning a package?

16  A:   If my memory serve me correctly, he said that

17       he -- after the business was closed it was

18       something about how he scanned a package wrong.

19       I don't know -- I don't remember how he said he

20       sheeted it up, but --

21  Q:   Do you know how he was supposed to sheet it up,

22       according to the company?

23  A:   As a miss.

24  Q:   Because the business was already closed?

25  A:   Exactly.

ERIC KELLEY                                160

1    Q:    Is it possible that he scanned it up as not

2          ready?

3    A:    Oh, I don't know.

4    Q:    Okay.   Anything else you recall about that

5          conversation with Mr. Santos?

6    A:    That's about it.

7    Q:    And I seem to recall that you -- there was

8          evidence offered that you had prepared and

9          perhaps filed a grievance regarding the

10         incident with Mr. Santos?  In other words, did

11         you ever -- do you recall ever filing a

12         grievance saying something to the effect of Mr.

13         Santos did the same thing I did and he didn't

14         get disqualified?

15   A:    No, I didn't.   I spoke with my business agent

16         --

17   Q:    Okay.

18   A:    -- about it.

19   Q:    What did Mr. Eason say?

20   A:    There, once again, he told me that they can

21         fire you, disqualify you for anything during

22         your 30 day grace period and there's nothing

23         that you could do.

24   Q:    And you can't grieve a disqualification?

25   A:    According to him, he said there was nothing I

ERIC KELLEY                                          161

1              could do about it.

2     Q:    Okay.    So  other  than  the  incident  with  Mr.

3           Santos, are there any other facts that lead you

4           to  believe  your  disqualification  in  2008  was

5           based on race?

6     A:    Just  like  I  said,  there  was  one  incident  that

7           where -- and this is the same thing, and I did

8           file  on  this.    Where -- where  they  disqualified

9           me  for  sheeting  up  that  package  wrong  and

10          sheeting  it  up  as  not  ready,  but  they  sent  the

11          white  guy,  Chris  Sims,  a  message  to  sheet  up --

12          there  was  a  package  that  was  missed  and  they

13          sent  the  message  to  him  to  sheet  it  up  as  not

14          ready.

15    Q:    And who is they?

16    A:    Management.

17    Q:    Do you know who specifically in management?

18    A:    I can't remember.  I don't know.

19    Q:    Did you ever see a copy of the message?

20    A:    Let me think here.  No, I talked with Chris and

21          I  don't  remember  seeing  the  message,  but  he,

22          you  know,  told  me  about  it.    And  I  also

23          remember  him  and  a  shop  steward,  which  was  Ed

24          Milligan,  talking  about  it  and  they  both  knew

25          it  was  wrong.    I  don't  believe  Chris  sheeted  it

| | ERIC KELLEY | 162 |
|---|---|---|

```
 1          up like they told him to, but Ed Milligan told
 2          Chris that, you know, that was the same thing
 3          that Kelley was disqualified for and I heard
 4          him tell him that.
 5     Q:   Do you recall when it was that Mr. Sims did
 6          this?
 7     A:   I've got it written down, but I don't have the
 8          -- I don't know.  I don't remember.
 9     Q:   Okay.  But you did file a grievance on it?
10     A:   Yes, I did.
11     Q:   And what happened with that grievance?
12     A:   There again, I tried to get it overturned and
13          it didn't happen.
14     Q:   Did Mr. Sims receive any discipline based on
15          the incident?
16     A:   No.
17     Q:   And what exactly, the best you can recall, Mr.
18          Sims was instructed to do with respect to a
19          package?
20     A:   Say that again.
21     Q:   What is the instruction that Mr. Sims told you
22          he received from management regarding the
23          package?
24     A:   The instruction was to sheet up a package as
25          not ready instead of missed.
```

ERIC KELLEY                                        163

1    Q:   Do you know whether any attempt was ever made

2         on that package?

3    A:   I don't.

4    Q:   Chris didn't say one way or another?

5    A:   No.

6    Q:   Do you know whether the business to which the

7         package was addressed was open at the time or

8         not?

9    A:   No, I don't.

10   Q:   Do you know any other circumstances about him

11        being instructed to sheet something up as not

12        ready?

13   A:   No.

14   Q:   And the grievance, I think you testified,

15        didn't go anywhere?

16   A:   I'm trying to remember exactly what happened.

17        I know I filed it.  I just can't remember what

18        happened with it.

19   Q:   Okay.  Other than the incident with Mr. Santos

20        and the incident with Mr. Sims, are there any

21        other facts that you believe demonstrate that

22        the disqualification in 2008 was based on race?

23   A:   Yeah, it was several incidents.  I mean, these

24        guys where David Simpson -- I had to go out on

25        a, it's not actually a road test, but it's --

ERIC KELLEY                                    164

1    you have to do it every year as a driver for

2    safety.

3  Q:  A ride-along or a safety ride?

4  A:  Right, exactly.  And I completed that with Tom

5    Drumm.  And after I got back to the building,

6    you know, Tom told me that I did an excellent

7    job.  You know, you passed, you're good to go.

8    And then when I came back in that afternoon on

9    my regular job, David Simpson -- not David,

10   excuse me.  David Brandon approached me and

11   asked me did anybody tell you that you were

12   supposed to see me before you left after you

13   finished your safety test, road test, and I

14   said no and he said, well, you were supposed

15   to.  So he called me in the office and asked me

16   to -- well, first he told me -- I mean, I

17   replied that, you know, Tom Drumm had gave me

18   the test and I had already passed with him and

19   he told me that wasn't good enough, you were

20   supposed to see me before you left.

21 Q:  And what year?  This was during that 2008

22   disqualification?  During your qualification

23   period that year?

24 A:  No, I was just -- I wasn't --

25 Q:  Let me ask it this way.  Do you recall when

| | ERIC KELLEY | 165 |

```
 1          this conversation with Mr. Brandon took place?

 2   A:     Okay, this was -- gosh.  And I could be wrong.

 3          This conversation, it may have been -- I know

 4          it was February 15th, maybe '08, '08 or '07.

 5   Q:     '08 or '07.  During a qualification period or

 6          once you were already an air driver?

 7   A:     Right, I was already an air driver.

 8   Q:     Okay.

 9   A:     So he told me that, you know, that wasn't good

10          enough with me passing that road test with Tom

11          Drumm.

12   Q:     Well, I want to make sure we keep the

13          terminology straight.  That it wasn't a road

14          test.  It was a ride-along, a safety drive.

15   A:     Okay, right.

16   Q:     An annual requirement for all drivers, correct?

17   A:     Exactly.

18   Q:     Okay.

19   A:     Exactly.

20   Q:     Okay.  Just want to make sure we're on the same

21          page.  All right, so please continue with what

22          Mr. Brandon told you.

23   A:     Okay.  And he called me in the office and he

24          asked me to say what we call -- this is the

25          safety also.  It's called a ten point
```

**ERIC KELLEY**                                         166

1      commentary.

2   Q:   All right.

3   A:   Okay.  And as I stated those -- and it was ten

4        of them and you have certain things, certain

5        words in big bold letters, and then you got the

6        fine print.  Well, in the school they told us

7        that if you can recite what's in the big bold

8        letters, it will give you the general idea on

9        what you're supposed to be doing.  And so when

10       he asked me to say the ten point commentary, I

11       did.  I said them and then he said, no, that's

12       -- I said everything that was in the big bold

13       letters and he told me, no, that's not good

14       enough.  I need to know the stuff in the fine

15       print.

16  Q:   And were you able to provide him that?

17  A:   No, I told him I didn't know that and that they

18       told us if we just remember the stuff in the

19       big bold letters it would give us a general

20       idea of what we're supposed to do.  And then he

21       told me, said, well -- he said, well, he say,

22       see, you went and you got your little lawyer

23       and you don't even know your safety

24       commentaries and he told me, he said, you can't

25       drive for me.

ERIC KELLEY                                          167

1    Q:    When was this?  I'm sorry, you said it was

2          February 15th, you think 2008?

3    A:    Right, either -- I want to say 2008, but it may

4          be '07.

5    Q:    Okay.  Now, what did you understand Mr. Brandon

6          to be referring to when he mentioned the

7          lawyer?

8    A:    Because I had -- I had consulted with a lawyer

9          to get my -- try to get my records, my file,

10         because they were refusing to give them to me.

11   Q:    So that's what you understood Mr. Brandon to be

12         referring to?  You had your lawyer contact UPS

13         about --

14   A:    Right.

15   Q:    -- requesting --

16   A:    Right.

17   Q:    -- your personnel file?

18   A:    Exactly, yes.

19   Q:    And that's what you believe Mr. Brandon was

20         referring to?

21   A:    Oh, yes.

22   Q:    Okay.

23   A:    Because that's --

24   Q:    Do you have --

25   A:    That's what he said.

ERIC KELLEY                                168

1  Q:   Do you have any understanding as to whether an

2       employee in South Carolina is entitled to

3       request a copy of their personnel file?

4  A:   Do I have what now?

5  Q:   What's your understanding of an employee in

6       South Carolina's right to obtain a copy of

7       their personnel file?

8  A:   I think you have the right if you wanted to,

9       you know, look at your file.  You just have a

10      right to do that.

11 Q:   Okay.  After this discussion with Mr. Brandon

12      were you discharged?

13 A:   Yes.

14 Q:   And what was the basis for your discharge,

15      according to the company?

16 A:   I mean, I didn't receive any -- any paperwork

17      or anything, and he told me I couldn't drive

18      and I didn't drive that next Saturday, but what

19      I did -- at that time the center manager was

20      Kelsey.  As a matter of fact, I think it was --

21      he had already left the building and Tanisha,

22      I mean she was in there when this went -- as a

23      matter of fact, Tom Drumm was in there, too,

24      and he asked Tom Drumm to say those same thing

25      and Tom Drumm couldn't do it.

ERIC KELLEY                                      169

1   Q:   Now, who is he?  Mr. Brandon or Kelsey?

2   A:   Tom?

3   Q:   I'm sorry.  Who asked Tom Drumm to recite the

4        ten point --

5   A:   David.

6   Q:   -- commentary?

7   A:   David.

8   Q:   David.

9   A:   Right, and Tom Drumm ran out of the room.

10  Q:   And Mr. Drumm was an on-car supervisor?

11  A:   Correct.

12  Q:   Okay.

13  A:   He actually gave me the safety test that

14       morning.

15  Q:   Okay.  So I'm trying to figure out, were you

16       ever -- did you receive a warning letter or any

17       other formal disciplinary action as a result of

18       this conversation with Mr. Brandon?

19  A:   No.

20  Q:   Okay.

21  A:   No.  But they had -- but Tanisha contacted

22       Kelsey.  He was the center manager at that

23       time.  And he had to come back to the building

24       to talk with David about that.

25  Q:   Were you present for that discussion?

ERIC KELLEY                                    170

1    A:    No, no, they --

2    Q:    Did you ever talk to Mr. Cullum about the

3          discussion?

4    A:    I did.  He came back to me and said, look, I

5          tried to talk with him, he didn't change his

6          mind and that he couldn't go over his head.

7    Q:    Change his mind about what?

8    A:    About my being taken off the road as an air

9          driver.

10   Q:    But didn't you stay on the road as an air

11         driver?

12   A:    No, I didn't work that Saturday.  As a matter

13         of fact, I didn't work that Saturday, but after

14         my business agent got involved and talked with

15         him -- and I don't know, didn't hear that

16         conversation either.

17   Q:    Talked with David?

18   A:    Right.

19   Q:    After that you came back to work?

20   A:    Right, he sent an email saying that it was a

21         misunderstanding.

22   Q:    Okay.

23   A:    But that wasn't --

24   Q:    So you missed one Saturday as a result?  I'm

25         sorry to cut you off.  Go ahead, please

**ERIC KELLEY**                                    171

1      continue.

2   A:  Right, I was just going to say, but that wasn't

3       no misunderstanding.    I mean, the center

4       manager went and talked to him about it and he

5       still said that I couldn't drive.

6   Q:  So you missed one Saturday as a result, is that

7       your testimony?

8   A:  Right.

9   Q:  And then the next Saturday you were driving air

10      again?

11  A:  Right.

12  Q:  Okay.  So you never filed a grievance on it?

13  A:  No.

14  Q:  All right.    Any other incidents that you

15      believe support the claim that the

16      disqualification in 2008 was discriminatory

17      based on race?

18  A:  I mean, there's a lot of things that happened

19      with 2005 back in -- which was Brad.    The

20      second time that I went to advance, there

21      again, Brad.

22  Q:  Was that 2006 or 2007?

23  A:  I'm not really sure with the second time, what

24      year the second time was.

25  Q:  One of those two years, though?

ERIC KELLEY                                172

1    A:   Right.

2    Q:   Okay.

3    A:   And Brad was my instructor then.  And in 2008

4         there was where he came, you know, he will ride

5         with you, the instructor rides with you for a

6         day, and they'll turn you loose and then they

7         kind of follow you around just to see how you

8         perform.  Well, the second day he came to my

9         truck.

10   Q:   He is Brad?

11   A:   He is Brad.

12   Q:   Okay.

13   A:   And was angry.  And told me, why don't you just

14        go back to the center and tell them that you

15        want your job back, your old job back.

16   Q:   Because he didn't believe you were performing

17        at the level you should?

18   MR. BABB:  Object to the form of the question.  You

19        can answer.

20   A:   I mean, I just --

21   Q:   Well, did you --

22   A:   I didn't --

23   Q:   Did you understand him to be dissatisfied with

24        your performance?

25   A:   I understood that he was -- they was targeting

*CREEL COURT REPORTING, INC.*
1230 Richland Street / Columbia, SC 29201
(803) 252-3445 / (800) 822-0896

ERIC KELLEY                                    173

1       me.

2   Q:  But on that specific day why do you believe it

3       was -- I mean, let me rephrase it.  Did Brad or

4       did Mr. Hanser indicate why it was that he was

5       telling you you should go back to the center?

6   A:  No, he didn't.

7   Q:  Did you understand him to be dissatisfied with

8       your performance that day?

9   A:  I didn't know why, but I told him, I said,

10      look, I can do this if you'll just give me a

11      fair chance.

12  Q:  So by that comment, it seems like you did

13      understand that he wasn't satisfied with your

14      performance.

15  **MR. BABB:**  Object to the --

16  A:  Well, I --

17  **MR. BABB:**  -- form of the question.

18  A:  -- mean --

19  **MR. BABB:**  Hold on.  Object to the form of the

20      question.  You may answer.

21  A:  Okay.  I mean, just like I said, I didn't know

22      why.  I guess, I mean, I didn't really know why

23      he was -- I just -- you know, there was so much

24      going on, I just wanted him to just treat me

25      fair, leave me alone, and let me do my job.

ERIC KELLEY                                    174

1    Q:    But isn't his job to evaluate you and observe

2          you as you're performing these duties?

3    A:    Correct.

4    Q:    That's his responsibility, right?

5    A:    Right.

6    Q:    So if he left you alone and didn't evaluate

7          your performance, he wouldn't be doing his job,

8          right?

9    **MR. BABB:**  Object to the form of the question.

10   A:    Right.  I mean, what I'm saying is the yelling,

11         the being angry, telling me to just go back to

12         my job, my old job.  I mean, I didn't mind him

13         being my instructor, but, you know, be fair.

14   Q:    All right.  So what was unfair about the day in

15         2006 or 2007 when you said he told you to go

16         back to your old job?

17   A:    That was it.  The way he came up to my truck

18         yelling at me.

19   Q:    What did you do after he made this comment to

20         you?

21   A:    Well, the next day I reported it.  We had a

22         meeting upstairs.

23   Q:    Did Mr. Hanser discharge you that day?

24   A:    No.

25   Q:    Did you continue to deliver packages that day?

ERIC KELLEY                                                    175

1    A:    Right.

2    Q:    All right.  So you said you had a meeting the

3          next day about it?

4    A:    Right, with -- I can't remember.  I know the

5          guy name is Darrell, I can't remember his last

6          name, and Ms. Roxanne.   It's like our early

7          meeting in the morning and they ask us, you

8          know, if we had any concerns, to talk with them

9          about and --

10   Q:    Who is Darrell?

11   A:    He's a UPS driver.  I can't remember his last

12         name.

13   Q:    And who is Roxanne?

14   A:    She also a UPS driver.

15   Q:    And you brought this up with them?

16   A:    Yes, I did.

17   Q:    Are they union stewards?

18   A:    I know they got something to do with safety.

19         I'm not sure whether they're union or not.

20   Q:    Okay.  And you spoke with them about it and

21         what happened next?

22   A:    And then Brad -- I had no problems out of him.

23   Q:    After that?

24   A:    After that.

25   Q:    Do  you  know  whether  Brad  received  any

ERIC KELLEY                                          176

1          discipline in connection with this meeting?

2    A:    No, I don't.

3    Q:    Do you know who spoke with Brad after the

4          meeting?

5    A:    No.

6    Q:    What did you understand that Darrell and

7          Roxanne were going to do with this information

8          once they had it?

9    A:    Maybe go and talk with management.

10   Q:    Okay. But they never came back to you and

11         said, hey, we talked to so and so and --

12   A:    No, no, they did not.

13   Q:    Is there anything else about -- that you

14         contend supports your claim that the

15         disqualification in 2008 was discriminatory?

16   A:    Okay. Here again, I don't know what year this

17         is, but since we're talking about Ms. Roxanne.

18         They was always saying I was dishonest and I

19         think they talked with me about my attendance.

20   Q:    You don't remember what year this was?

21   A:    No, I don't.

22   Q:    Did you receive a warning letter or some other

23         disciplinary action?

24   A:    No.

25   Q:    Who talked with you about attendance?



124 Creekside Road
West Columbia, SC 29172
803.822.6215 Tel
803.822.6459

January 9, 2009

Eric Kelley
1618 Willis Dr.
Hartsville, SC 29550

Dear Eric:                          ID# 0257772

On January 3, 2009, you were grossly insubordinate and abandoned your job.

Therefore, because of your action, your employment with UPS is terminated.

This is an official termination letter as outlined in the current labor agreement between the I.B.T. Local # 71 and UPS.

Sincerely,
UPS,

Robert Hanser
Business Manager

PC:    Local # 71
       Rich McArdle
       Walt Dickson
       David Brandon
       File
       Certified Mail # 7006 2760 0005 3955 0177
       Certified Mail # 7006 2760 0005 3955 8242



P25